**Eleanor Taft TILTON et al., Plaintiffs,**

**v.**

**Robert H. FINCH, Secretary of the United States Department of Health, Education and Welfare, James E. Allen, Jr., Commissioner of Education of the United States, Marvin K. Peterson, Chairman of the Commission on Aid to Higher Education of the State of Connecticut, Sacred Heart University, Annhurst College, Fairfield University, Albertus Magnus College, Defendants.**

**Civ. No. 12767.**

United States District Court,
D. Connecticut.

March 19, 1970.

Probable Jurisdiction Noted
June 22, 1970.
See 90 S.Ct. 2200.

---

Leo Pfeffer, New York City, Peter L. Costas, Melvin S. Katz, Paul W. Orth, Robert Smith, Hartford, Conn., and Jerry Wagner, Bloomfield, Conn., for plaintiffs.

Jeffrey F. Axelrad, Atty., William D. Ruckelshaus, Asst. Atty. Gen., Harland F. Leathers, Atty., Dept. of Justice, Washington, D. C., Stewart H. Jones, U. S. Atty., and F. Mac Buckley, Asst. U. S. Atty., Hartford, Conn., for defendants Robert H. Finch and James E. Allen, Jr.

F. Michael Ahern, Asst. Atty. Gen., and Robert K. Killian, Atty. Gen., State of Connecticut, Hartford, Conn., for defendant Marvin K. Peterson.

Edward Bennett Williams, Jeremiah C. Collins and Charles H. Wilson, Jr., of Williams & Connolly, Washington, D. C., for all defendant colleges and universities.

James J. O'Connell, of Coles, O'Connell & Dolan, Bridgeport, Conn., for defendant Sacred Heart University.

Howard T. Owens, of Owens & Schine, Bridgeport, Conn., for defendants Annhurst College and Fairfield University.

Donald F. Keefe, Lawrence W. Iannotti and Bruce Lewellyn, of Tyler, Cooper, Grant, Bowerman & Keefe, New Haven, Conn., for defendant Albertus Magnus College.

Before J. JOSEPH SMITH, Circuit Judge, and TIMBERS and BLUMENFELD, District Judges.

TIMBERS, District Judge:

## QUESTIONS PRESENTED

This taxpayers suit seeking declaratory and injunctive relief with respect to the Higher Education Facilities Act of 1963, 20 U.S.C. §§ 701–58 (1964) (the Act), presents the following essential questions:

(1) Whether the Act authorizes grants to defendant church related colleges and universities for construction of academic facilities.

(2) If so, whether the Act and grants thereunder impair plaintiffs' rights under the establishment clause or the free exercise clause of the First Amendment of the Constitution of the United States.

■ For the reasons stated below, we hold that the Act does authorize the grants in question and that neither the Act nor the grants thereunder impair plaintiffs' constitutional rights in the respects claimed.[1] Judgment therefore must be entered for defendants dismissing the complaint.

## PARTIES TO THE ACTION

■ Plaintiffs are fifteen residents and citizens of the United States and of Connecticut. They are federal taxpayers suing for themselves and others similarly situated. As taxpayers they have standing to sue. Flast v. Cohen, 392 U.S. 83, 88–91 (1967); see Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150 (1970), and Barlow v. Collins, 397 U.S. 159 (1970).

Defendant government officials are the Secretary of the Department of Health, Education and Welfare of the United States, the Commissioner of Education for the United States, and the Chairman of the Connecticut Commission on Aid to Higher Education; they are sued in their official capacities, particularly with respect to their duties in the administration of the Act. Defendant colleges and universities are Sacred Heart University, Annhurst College, Fairfield University and Albertus Magnus College, four church related Connecticut colleges and universities;[2] they are sued as recipients under the Act of grants for the construction of various academic facilities.

## CLAIMS OF THE PARTIES

Plaintiffs claim that the Act does not authorize grants to defendant colleges and universities for construction of academic facilities; and, if the Act does authorize such grants, the Act and grants violate the establishment clause and the free exercise clause of the First Amendment. Accordingly, plaintiffs seek (i) a declaratory judgment that the determinations and actions of defendant government officials in allocating federal funds to defendant colleges and universities for construction of academic facilities are not authorized by the Act, or, in the alternative, if the Act authorizes such grants, a declaratory judgment that the Act to that extent is unconstitutional and the grants are void; (ii) injunctive relief enjoining defendant government officials from recommending and approving any program for the expenditure of federal funds to finance in whole or in part construction of academic facilities in "sectarian educational institu-

---

1. Plaintiffs assert a further claim that, to the extent that funds are granted under the Act to "sectarian" institutions, to that extent "non-sectarian" institutions are deprived of such funds and are discriminated against, in violation of the First and Fourteenth Amendments. We also reject this claim as lacking merit. The eligibility of an institution for grants under the Act does not depend upon its relation to any organized religion.

2. The amended complaint alleges that each of the four defendant institutions are "or-

ganized for and engaged in the propagation and promotion of the doctrine, teachings and practices of the Roman Catholic religion"; that three of the institutions, Annhurst College, Fairfield University and Albertus Magnus College, are "organized, conducted and controlled" by religious orders; and that the fourth, Sacred Heart University, is "organized, conducted and controlled" by the Diocese of Bridgeport of the Roman Catholic Church. Amended complaint, ¶¶ 12–16.

tions" and enjoining defendant colleges and universities from receiving any more funds already awarded under the Act; and (iii) such further relief as may be just and proper.

Defendants' position is that the grants received by defendant colleges and universities are authorized by the Act and that the Act and grants do not impair plaintiffs' constitutional rights.

## JURISDICTION

This Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. § 1331(a) (1964).

■ Since the action seeks injunctive relief with respect to an Act of Congress on the ground of repugnance to the Constitution of the United States, a special statutory district court of three judges was convened to hear and determine the action pursuant to 28 U.S.C. §§ 2282 and 2284 (1964).

## HEARINGS AND RECORD

The pleadings having been closed, the Court held a five day hearing at Hartford on the merits.

The record before the Court consists of the pleadings; facts established by stipulation; some 155 documentary exhibits; and the testimony of 22 witnesses.

Counsel for the respective parties have been fully heard in oral argument; and they have submitted helpful briefs, together with proposed findings of fact and conclusions of law.

## CLAIM THAT ACT DOES NOT AUTHORIZE GRANTS TO DEFENDANT COLLEGES AND UNIVERSITIES

The threshold question is whether the Act authorizes grants to defendant col-

leges and universities for construction of academic facilities, plaintiffs' initial claim being that Congress did not intend to make church related institutions of higher education eligible for grants under the Act.

The Act by its terms neither includes nor excludes church related institutions as such; it simply authorizes grants to "institutions of higher education"[3] of federal funds for construction of academic facilities.

■ The Act, however, defines an "institution of higher education"—without regard to whether it is church related or not—as an institution which is nonprofit, accredited and legally authorized by the state in which it is located to provide a program of education beyond high school.[4] Since church related colleges and universities may meet these criteria, they may be eligible for grants under the Act.

Moreover, the Act forbids grants for construction of "any facility used or to be used for sectarian instruction or as a place for religious worship" or "any facility which . . . is used or to be used primarily in connection with any part of the program of a school or department of divinity".[5] These limitations in the Act itself make it plain that grants for construction of academic facilities to be used in connection with other functions of church related colleges and universities were contemplated.

Indeed the legislative history is quite conclusive that Congress intended to make the benefits of the Act available to church related colleges and universities.[6] Not only did the sponsors and floor managers of the legislation so state in the debate,[7] but amendments to deny the benefits of the Act to such institutions were voted down.[8]

3. 20 U.S.C. §§ 711, 716 (1964).

4. 20 U.S.C. § 751(f) (1964).

5. 20 U.S.C. § 751(a)(2)(1964).

6. For the legislative history of the Act, see generally 1963 U.S.Code Cong. and Adm.News, pp. 1172–1202.

7. 109 Cong.Rec. 14150–51 (1963) (Remarks of Representative Powell); id. at 14159 (Remarks of Representative Quie); id. at 18409–12 (Remarks of Senator Prouty); id. at 18427–30 (Remarks of Senator Morse).

8. 109 Cong.Rec. 19492–96 (1963).

■ As to whether the Act authorizes the instant grants to defendant colleges and universities, we hold on the basis of the entire record before the Court that defendant government officials clearly acted in accordance with the provisions of the Act and within the scope of their authority in recommending and approving the grants in question.[9]

Having held that the Act authorizes the grants to defendant colleges and universities for construction of academic facilities, we turn now to plaintiffs' claims that the Act and the grants thereunder impair their constitutional rights.

### ESTABLISHMENT CLAUSE CLAIM

Plaintiffs' primary claim challenging the constitutionality of the Act and the grants is that they violate the establishment clause of the First Amendment which provides that "Congress shall make no law respecting an establishment of religion . . .."[10] Plaintiffs assert that federal aid in the form of construction grants to private church related educational institutions constitutes government aid to religion.

The Supreme Court has not ruled on the precise issue here presented, although it has examined the scope and meaning of the establishment clause in several decisions. Only in Everson v. Board of Education, 330 U.S. 1 (1947), and Board of Education v. Allen, 392 U.S. 236 (1968), however, has the Supreme Court touched upon the establishment clause validity of government aid to private church related education.[11]

*Everson* involved an establishment clause challenge to a New Jersey statute which provided state reimbursement to parents of parochial school children as well as to parents of public school children for the cost of bus transportation to and from school. The Supreme Court held that the statute did not violate the

9. Reference is made to the Court's separate Findings of Fact filed herewith for a more detailed statement of the nature and purpose of the grants here involved and the manner in which the applications for such grants have been processed by defendant government officials.

10. More specifically, plaintiffs allege as the first count in their amended complaint that the determinations and actions of defendants "effect a contribution of tax-raised funds to the support of institutions which teach the tenets of a church and constitute governmental financing of religious groups and government action whose purpose and primary effect is to advance religion" in violation of the establishment clause. Amended complaint, ¶ 29.

11. There are pending a number of recent cases involving challenges under the establishment clause of the First Amendment, made applicable to the states by the Fourteenth Amendment, with respect to the validity of state statutes which authorize use of state funds to aid church related education. See, e. g., Opinion Of The Justices, 261 A.2d 58 (Me.1970), (proposed Maine Nonpublic Elementary Education Assistance Act of 1970, authorizing purchase of secular educational services from nonpublic schools, *held* (4–2), to violate establishment clause); Lemon v. Kurtzman, 310 F. Supp. 35 (E.D.Pa.1969), *prob. juris noted*, 397 U.S. 1034 (1970) (Pennsylvania Nonpublic Elementary and Secondary Education Act of 1969, authorizing payment of state funds to nonpublic elementary and secondary schools as reimbursement for teaching certain secular subjects, *held* by a three-judge district court (2–1), not to violate establishment clause); Vermont Educational Buildings Financing Agency v. Mann, 127 Vt. 262, 247 A.2d 68 (1968), *prob. juris. noted*, 394 U.S. 957 (1969), *juris. postponed*, 396 U.S. 801 (1969), *dismissed pursuant to stipulation of the parties*, June 1, 1969) (Vermont Educational Building Financing Act of 1966, authorizing leasing and subleasing agreements between state agency and church related college for construction of classroom and science building, *held* (4–1), not to violate establishment clause); Connecticut Civil Liberties Union v. Sanders, Civil No. 13432 (D.Conn., complaint filed September 30, 1969, action pending before three-judge district court) (Connecticut Act Concerning Assistance To Nonpublic Schools For Secular Education of 1969, authorizing Secretary of State Board of Education to purchase from nonpublic schools secular educational services for students, challenged, *inter alia*, as violative of establishment clause).

establishment clause. In the course of its opinion, the Court stated:

"No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they be called, or whatever form they may adopt to teach or practice religion." 330 U.S. at 16.

Although this language, read in isolation, might suggest that the establishment clause renders impermissible any government aid to church related educational institutions, such suggestion is dispelled by the Court's actual decision sustaining the statute. The Court so held even though it recognized that parochial schools received some benefit from state subsidization of bus transportation for parochial school children. 330 U.S. at 17. The Court noted that a state could not exclude individuals *"because of their faith, or lack of it,* from receiving the benefits of public welfare legislation." (Emphasis that of the Court) 330 U.S. at 16. Since it viewed state subsidization of bus transportation as a public welfare measure in the same category as such general government services relating to schools as police and fire protection, sewage disposal, public highways and sidewalks, it concluded that the challenged statute did not violate the establishment clause. 330 U.S. at 17–18.

*Allen,* the most recent Supreme Court decision dealing with government aid to church related education, involved an establishment clause challenge to a New York statute authorizing the state to loan secular school textbooks to parochial school students. In determining the validity of the challenged statute, the Court utilized the secular purpose and primary effect test under which "to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion." 392 U.S. at 243, quoting from Abington School District v. Schempp, 374 U.S. 203, 222 (1963), where the secular purpose and primary effect test was first enunciated. Applying this test in *Allen,* the Court upheld the statute on the ground that its stated legislative purpose clearly was secular and the primary effect of the loan of secular textbooks could not be said either to advance or inhibit religion.

■ We are not persuaded by plaintiffs' argument that *Allen* establishes some sort of child-benefit theory under which direct government aid to church related educational institutions is not permissible, while government aid to students attending such institutions is permissible because government aid to an institution in the form of student subsidies is not direct. Although the challenged statute in *Allen* authorized aid to parochial school students and their parents rather than to the schools themselves, the Court neither held nor suggested that the identity of the direct recipient of the aid was the critical factor in determining the constitutionality of the statute under the establishment clause.[12] Moreover, the child-benefit or indirect-direct aid approach would fashion an unacceptable test based on form rather than substance inasmuch as the "constitutional result would depend upon minute distinctions and technicalities." Lemon v. Kurtzman, *supra* note 11, at 47–48. Consequently, we view *Allen* as confirming the secular purpose and primary effect test, rather than a child-benefit test, as controlling with respect to the establishment clause validity of the Act. Lemon v. Kurtzman, *supra* note 11, at 47–48; Vermont Educational Buildings Financing Agency v. Mann, *supra* note 11, at 270–71.

■ Applying the secular purpose and primary effect test to the Act here in question, we find that it clearly meets the first requirement of a secular legislative purpose. The purpose of the Act

12. See also Bradfield v. Roberts, 175 U.S. 291 (1899), a much earlier decision, in which the Court sustained a federal statute authorizing direct federal aid to a hospital owned and controlled by a corporation composed of members of a monastic order or sisterhood of the Roman Catholic Church.

appears on its face. It contains a congressional declaration that the policy underlying the Act is to increase the student enrollment capacity of the Nation's institutions of higher education through grants for construction of academic facilities to help provide young people with the greatest possible opportunity for higher education; and such declaration is based on congressional findings that there is an urgent need for construction of such facilities to enable these institutions to accommodate anticipated increases in student enrollments.[13] These findings are based on evidence before Congress of the great need for expansion of educational facilities; and of the high proportion of private, including church related, colleges and universities available for such expansion. There was ample rational basis in the evidence before Congress for such findings. We do not believe it to be within our competence to question such findings. United States v. Gainey, 380 U.S. 63, 66–68 (1965); Katzenbach v. McClung, 379 U.S. 294, 303–04 (1964); Tot v. United States, 319 U.S. 463, 466 (1943). We hold, based on Congress' declaration of policy and findings, that the Act has the secular purpose of increasing the student enrollment capacity of the Nation's institutions of higher education—an existing urgent public need—and that the Act does not have the purpose of promoting religion of any kind.

The Act also meets the second requirement of a primary effect that neither advances nor inhibits religion. The focus of this test as applied in *Allen* is the function, secular or religious, which the government aid subsidizes—not the nature of the institution, secular or religious, which receives the aid.[14] In *Allen*, the Court noted that it long had recognized that church related educational institutions pursue two goals: secular education and religious instruction. 392 U.S. at 245–48.

The history of church related educational institutions in this Country reflects this dual function. Legislative, judicial, and prevailing social attitudes demonstrate beyond question that church related educational institutions play a large and vital role in, providing secular education. Legislative and judicial determinations have long established that a state's interest in secular education does not require that all children attend publicly operated schools; attendance at church related schools satisfies state compulsory education laws provided the schools meet state secular education requirements. The Supreme Court summarized in *Allen, supra, at* 247–48, from the standpoint of the constitutional standard applied in that case, the relationship of the sectarian function to the secular education function of private schools, including parochial schools:

"Underlying these cases, and underlying also the legislative judgments

---

13. The Act's statement of congressional findings and declaration of policy reads as follows (20 U.S.C. § 701 (1964)) :
   "The Congress hereby finds that the security and welfare of the United States require that this and future generations of American youth be assured ample opportunity for the fullest development of their intellectual capacities, and that this opportunity will be jeopardized unless the Nation's colleges and universities are encouraged and assisted in their efforts to accomodate rapidly growing numbers of youth who aspire to a higher education. The Congress further finds and declares that these needs are so great and these steps so urgent that it is incumbent upon the Nation to take positive and immediate action to meet these needs through assistance to institutions of higher education, including graduate and undergraduate institutions, junior and community colleges, and technical institutes, in providing certain academic facilities."

14. In Horace Mann League v. Board of Public Works, 242 Md. 645, 220 A.2d 51, *cert. denied, appeal dismissed,* 385 U.S. 97 (1966), the Maryland Court of Appeals held that the constitutionality of direct construction grants under the establishment clause depended on whether the recipient institution was "sectarian". We believe this holding is inconsistent with the controlling *Allen* secular purpose and primary effect test.

that have preceded the court decisions, has been a recognition that private education has played and is playing a significant and valuable role in raising national levels of knowledge, competence, and experience. Americans care about the quality of the secular education available to their children. They have considered high quality education to be an indispensable ingredient for achieving the kind of nation, and the kind of citizenry, that they have desired to create. Considering this attitude, the continued willingness to rely on private school systems, including parochial systems, strongly suggests that a wide segment of informed opinion, legislative and otherwise, has found that those schools do an acceptable job of providing secular education to their students. This judgment is further evidence that parochial schools are performing, in addition to their sectarian function, the task of secular education."

█ The Act before us was carefully drafted to insure that grants made to church related educational institutions would subsidize the secular rather than the religious functions of such institutions. It authorizes grants only for the construction of academic facilities to be used for secular purposes; and specifically prohibits grants for the construction of any facility to be used for religious instruction or worship.[15] In addition, there are other provisions of the Act and administrative regulations which insure that facilities constructed with federal grants are and will be used only for secular purposes.[16] We hold that the Act has a primary effect that neither advances nor inhibits religion.

█ For the reasons stated above, we conclude that plaintiffs' claim that the Act and grants to defendant colleges and universities for construction of aca-

demic facilities impair their rights under the establishment clause is without merit.

## FREE EXERCISE CLAUSE CLAIM

Plaintiffs also claim that the Act and grants impair their rights under the free exercise clause on the ground that they effect compulsory taxation for religious purposes.

█ Since the Act has a secular legislative purpose and a primary effect which neither advances nor inhibits religion, it cannot be said to effect taxation for religious purposes. Moreover, a legislative enactment does not abridge the free exercise clause unless it has a coercive effect on an individual in the practice of his religion. Plaintiffs have not shown that the Act coerces them as individuals in the practice of their religion in any way. *Allen, supra,* at 248–49; *Schempp, supra,* at 223; *Lemon, supra,* at 48–49. Therefore, plaintiffs' free exercise claim is without merit.

We are mindful of the centuries of human struggle that culminated in the sixteen cryptic words which constitute the establishment and free exercise clauses of the First Amendment; and we have profound respect for the framers of the Bill of Rights and their determination to erect a wall between church and state which must be kept high and impregnable.[17]

We also recognize the strong national policy of providing higher education for the burgeoning numbers of young men and women who aspire to and are qualified for a higher education.[18] Providing such education may well be critical to the survival of this Nation.

It would be ironic indeed if this Act of Congress, so specifically intended and precisely written to comply with the constitutional standard of a secular legisla-

---

15. 20 U.S.C. § 751(a) (2) (1964).

16. 20 U.S.C. § 754 (1964); 45 C.F.R. § 170.14 (1969); Plaintiffs' Exhibits 125 and 126.

17. Everson v. Board of Education, 330 U.S. 1, 18 (1947).

18. See Preamble to Higher Education Facilities Act of 1963, *supra* note 13.

tive purpose and a primary effect that neither advances nor inhibits religion, were to be stricken down in the name of religious freedom. Our careful study of the Act, its legislative history and the entire record before us leaves us with a strong conviction that the Act and the grants do not violate the establishment clause or the free exercise clause of the First Amendment.

In short, here we find no conflict between preservation of religious freedom and provision of higher education. Without both, we may end up with neither.

## CONCLUSIONS

We hold that:

(1) The Court has jurisdiction over the subject matter and the parties.

(2) The Act authorizes the grants made to defendant colleges and universities for construction of academic facilities.

(3) The Act and grants thereunder do not impair plaintiffs' rights under the establishment clause or the free exercise clause of the First Amendment.

(4) The Act and grants thereunder do not discriminate against non-sectarian institutions by depriving them of federal funds in violation of the First and Fourteenth Amendments.

(5) Plaintiffs are not entitled to injunctive relief against defendants.

(6) Defendants are entitled to judgment dismissing the complaint, but without costs.

This opinion, together with the separately stated Findings of Fact and Conclusions of Law filed herewith, constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 (a), Fed.R.Civ.P.

Defendants' motions to dismiss, which were made at the close of plaintiffs' opening statement and at the close of plaintiffs' case, are denied. Various motions to strike evidence, upon which the Court reserved decision, are denied insofar as they are directed at evidence which supports the Court's findings of fact and conclusions of law; in all other respects, the motions are dismissed as moot.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, after full hearing, makes the following Findings of Fact and Conclusions of Law which, together with the Court's opinion filed herewith, constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 (a), Fed.R.Civ.P.

## FINDINGS OF FACT

### (A) THE PARTIES

(1) Plaintiffs are fifteen residents and citizens of the United States and of Connecticut; they are federal taxpayers suing for themselves and others similarly situated; and as taxpayers they have standing to sue.

(2) Defendant Robert H. Finch is Secretary of the Department of Health, Education and Welfare of the United States; in that capacity he has executive responsibility for the operation of federal programs relating to education.

(3) Defendant James E. Allen, Jr. is Commissioner of Education for the United States (Commissioner); in that capacity he is in charge of the Office of Education of the United States (Office of Education), which administers and supervises various federal programs relating to education and assistance thereof.

(4) Defendant Marvin K. Peterson is Chairman of the Connecticut Commission on Aid to Higher Education (Connecticut Commission), which was created to implement the State's participation in the Higher Education Facilities Act of 1963, 20 U.S.C. §§ 701–58 (1964) (the Act).

(5) Defendant Sacred Heart University is a coeducational liberal arts university located in Fairfield, Connecticut.

(6) Defendant Annhurst College is a liberal arts college for women located in Woodstock, Connecticut.

(7) Defendant Fairfield University is a liberal arts university for men located in Fairfield, Connecticut.

(8) Defendant Albertus Magnus College is a liberal arts college for women located in New Haven, Connecticut.

### (B) STATUTORY SCHEME

(9) In 1963, Congress enacted the Higher Education Facilities Act. Title I of the Act (Title I), 20 U.S.C. §§ 701–21 (1964), authorizes grants of federal funds to institutions of higher education for construction of undergraduate academic facilities.

(10) An institution of higher education is eligible for a Title I grant for construction of an academic facility only if construction of such facility will result in an urgently needed substantial expansion of the institution's student enrollment capacity or of its capacity to carry out one of the other purposes of the Act. 20 U.S.C. § 716 (1964).

(11) An "institution of higher education" is defined in the Act as one which:

(a) admits as regular students individuals having a certificate of graduation from a high school, or the recognized equivalent thereof;

(b) is legally authorized within the State to provide a program of education beyond high school;

(c) is a public or other nonprofit institution;

(d) provides an educational program for which it awards a bachelor's degree; or provides not less than a two-year educational program which is acceptable for full credit toward a degree; or offers a two-year program in engineering, mathematics, or the physical or biological sciences which is designed to prepare the student to work as a technician and at a semiprofessional level in engineering, scientific, or other technological fields which require the understanding and application of basic engineering, scientific, or mathematical principles or knowledge;

(3) is accredited by a nationally recognized accrediting agency or association approved for that purpose by the Commissioner or meets one of the alternatives thereto. 20 U.S.C. § 751(f) (1964).

(12) The Act specifically excludes from its definition of academic facilities "any facility used or to be used for sectarian instruction or as a place of religious worship, or . . . any facility which (although not a facility described in the preceding clause), is used or to be used primarily in connection with any part of the program of a school or department of divinity . . . . " 20 U.S.C. § 751(a) (2) (1964).

### (C) REGULATORY SCHEME

(13) A State desiring to participate in the Title I grant program must designate a State agency which is broadly representative of the public and of institutions of higher education within the State and must submit to the Commissioner, through that agency, a State plan for participation in the program. 20 U.S.C. § 715(a) (1964).

(14) The State of Connecticut designated, as the State agency responsible for administration of the State's responsibilities under Title I, the Connecticut Commission, which is broadly representative of the public and of institutions of higher education in the State.

(15) In 1964, the Connecticut Commission adopted a State plan for participation in the Title I grant program; the plan was submitted to and approved by the Commissioner; the plan complies with all pertinent provisions of the Act.

(16) The Connecticut Commission receives applications for Title I grants

from institutions of higher education throughout the State of Connecticut.

(17) In accordance with the procedures of the Connecticut Commission, applications for grants are submitted on forms provided by the Commissioner.

(18) Instructions which accompany applications for use in their preparation and submission emphasize that academic facilities to be used for sectarian instruction, religious worship or primarily in connection with any part of the program of a school or department of divinity are not eligible for grants; in each application the institution applying for a grant gives certain assurances, including assurances that no part of the areas included in the proposed project will be used for such proscribed purposes.

(19) The Connecticut Commission employs a staff which reviews the applications to determine whether they meet various statutory criteria of eligibility, the requirements of the Commissioner and the requirements of the State plan adopted by the Connecticut Commission.

(20) Applications which are found to meet the statutory criteria of eligibility are then evaluated by the Connecticut Commission with respect to several factors contained in the State plan to determine the relative priorities of eligible projects for proper allocation of federal funds available to Connecticut in a particular fiscal year. The setting of relative priorities among eligible projects is specifically required by the Act. 20 U.S.C. § 717(a) (1964). The factors taken into account by the Connecticut Commission in setting the relative priorities are the projected future enrollment increases at an institution (both numerical and percentage); the institution's projected increase in facilities (both numerical and percentage); and the institution's utilization of facilities (which is determined according to a capacity/enrollment ratio, average weekly use of classrooms and average weekly use of laboratories). Consideration of these factors is intended to assure that the limited federal funds available for Title I projects will be awarded for those projects for which there is an urgent need consistent with the purposes of the Act.

(21) Based on the procedures described above in paragraphs (16) through (20), the Connecticut Commission decides which projects to recommend for grants and the amounts of the grants to be recommended. The recommendations of the Connecticut Commission are forwarded to the Commissioner for further review.

(22) The Office of Education maintains a staff which reviews the recommendations for grants from the several state agencies. The Office of Education seeks to assure itself that the applicant has complied with all applicable provisions of the Act and regulations promulgated thereunder, including the requirement that no eligible portion of a federally funded facility be used for religious worship or sectarian instruction or in connection with the program of a school or department of divinity.

(23) A grant under Title I is not approved unless the Office of Education is satisfied on the basis of its review of each application that the provisions of the Act and the regulations have been complied with. Where necessary or appropriate to the making of this determination, other information supplied by an applicant or otherwise available to the Office of Education is also taken into consideration.

(24) Successful applicants, upon being notified directly by the Office of Education that their grants have been approved, then execute a "Grant Agreement" which signifies their acceptance of the federal financial assistance.

(25) Thereafter, before grant funds may be disbursed, the following steps must be taken:

(a) Final working drawings and specifications of the funded facility must be submitted to and approved by the Commissioner.

(b) Standard "Terms and Conditions", incorporated into all grant agreements, must be satisfied.

### (D) THE GRANTS

(26) Sacred Heart University submitted an application to the Connecticut Commission for a Title I grant for construction of a new library.

(27) Annhurst College submitted an application to the Connecticut Commission for a Title I grant for construction of a new music, drama and arts building with an auditorium to be used for general academic programs.

(28) Fairfield University submitted an application to the Connecticut Commission for a Title I grant for construction of a new library building.

(29) Fairfield University also submitted an application to the Connecticut Commission for a Title I grant for construction of a new science building to house the biology, chemistry, mathematics and physics departments, the computer instructional and research division and some biology-related functions of the psychology department; the grant requested was for construction of the science building minus the computer facilities.

(30) Albertus Magnus College submitted an application to the Connecticut Commission for a Title I grant for construction of academic facilities to be located in a general academic building containing classrooms, faculty and administrative offices, faculty seminar room, student study area, language laboratories and adjoining offices and necessary related service and maintenance facilities; the grant was requested for construction of two language laboratories and adjoining offices and necessary related service facility in the general academic building.

(31) Each of these applications affirmatively demonstrated that the grant for which application was made would result in an urgently needed substantial expansion of the institution's student enrollment capacity and would be used solely for construction of secular academic facilities.

(32) Each of these applications affirmatively demonstrated that the grant for which application was made would be used only for construction of the facility specified therein; and that no part of any funds granted would be used to defray any part of the cost of any facility used or to be used for sectarian instruction or as a place for religious worship, or of any facility used or to be used primarily in connection with any part of the program of a school or department of divinity.

(33) The Connecticut Commission properly recommended each of these applications and transmitted them to the Office of Education which in turn properly approved each of them.

(34) Sacred Heart University has been the recipient of a Title I grant in amount of $367,100 for construction of a library which has been completed.

(35) The Sacred Heart University Library opened in November, 1968. The University presented evidence that no classes have been conducted in the library; that no restrictions have been imposed on the books that may be acquired for the library; that no religious worship or services have been conducted in the library; and that there are no religious symbols or plaques in or on the library. Plaintiffs presented no evidence to the contrary. The Sacred Heart University Library, and the federal funds which assisted its construction, have been used solely for non-religious purposes.

(36) Annhurst College has been the recipient of a Title I grant in amount of $444,182 for construction of a fine arts building with an auditorium which is currently under construction.

(37) The Annhurst College Fine Arts Building was scheduled for occupancy sometime after January, 1970. The College presented evidence that the building will be used for courses in music,

art and drama; that no religious worship or services will be conducted in the building; and that there will be no religious symbols or plaques in or on the building. Plaintiffs presented no evidence to the contrary. The Annhurst College Fine Arts Building, and the federal funds which are assisting its construction, will be used solely for non-religious purposes.

(38) Fairfield University has been the recipient of two Title I grants. The first was in amount of $500,000 for construction of a library which has been completed. The second was in amount of $537,500 for construction of a science building which is currently under construction.

(39) The Fairfield University Library opened in September, 1968. The University presented evidence that the library has been used only for the purposes stated in its grant application; that no restrictions have been imposed on the books that may be acquired for the library; that no classes have been conducted in the library; that no religious worship or services have been conducted in the library; and that there are no religious symbols or plaques in or on the library. Plaintiffs presented no evidence to the contrary. The Fairfield University Library, and the federal funds which assisted its construction, have been used solely for non-religious purposes.

(40) The Fairfield University Science Building, which was under construction at the time of trial, is scheduled to be completed in February, 1971. The University has represented to the federal government that the building will house its physics, chemistry, mathematics and biology departments, a portion of its psychology department, and a computer center. The University presented evidence that no limitations, religious or otherwise, will be imposed on the content of the courses that will be taught in the new building; that no religious worship or services will be conducted in the building; and that there will be no re-

ligious symbols or plaques in or on the building. Plaintiffs presented no evidence to the contrary. The Fairfield University Science Building, and the federal funds which are assisting its construction, will be used solely for non-religious purposes.

(41) Albertus Magnus College has been the recipient of a Title I grant in amount of approximately $21,000 for construction of a language laboratory which has been completed.

(42) The Albertus Magnus College Language Laboratory became operational in 1966. It has been used by students in modern foreign language courses as a means of improving their pronunciation. The College presented evidence that the language laboratory has been used for no purpose other than to assist students in improving their pronunciation; that the language laboratory has been used only for the purposes stated in the grant application; that no religious worship or services have been conducted in the language laboratory, and that there are no religious symbols or plaques in or on the language laboratory. Plaintiffs presented no evidence to the contrary. The Albertus Magnus College Language Laboratory, and the federal funds which assisted its construction, have been used solely for non-religious purposes.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction over the subject matter and the parties.

(2) This action is an adversary one presenting a justiciable controversy between the parties.

(3) Plaintiffs as federal taxpayers are properly representative of the class on behalf of which they sue and have standing to maintain this action.

(4) Defendant government officials are the principal persons charged

with the responsibilities, state and federal, of administering the Act.

(5) Defendant church related colleges and universities are recipients under the Act of grants for construction of academic facilities.

(6) In compliance with the Act and regulations promulgated thereunder, each of the grants in question has been properly approved by the Office of Education of the United States, following proper recommendation by the Connecticut Commission on Aid to Higher Education, such approvals and recommendations having been based upon applications affirmatively demonstrating that the grant in each instance would result in an urgently needed substantial expansion of the institution's student enrollment capacity and would be used solely for construction of secular academic facilities.

(7) The Act authorizes the grants made to defendant colleges and universities for construction of academic facilities.

(8) The Act and grants thereunder do not impair plaintiffs' rights under the establishment clause or the free exercise clause of the First Amendment.

(9) The Act and grants thereunder do not discriminate against nonsectarian institutions by depriving them of federal funds in violation of the First and Fourteenth Amendments.

(10) Plaintiffs are not entitled to injunctive relief against defendants.

(11) Defendants are entitled to judgment dismissing the complaint on the merits.

(12) No costs shall be taxed against any party to this action.