241 So.2d 213

Sidney A. SEEGERS et al.

v.

Mary Evelyn PARKER, Treasurer of the State of Louisiana, and William J. Dodd, Superintendent of Education for the State of Louisiana.

No. 50870.

Oct. 19, 1970.

Reasons for Judgment Oct. 26, 1970.

Dissenting Opinions Oct. 19 and 27, 1970.

Rehearing Denied Nov. 25. 1970.

Breazeale, Sachse & Wilson, Victor A. Sachse, Robert P. Breazeale, Frank P. Simoneaux, Baton Rouge, for appellants.

A. Leon Hebert, Baton Rouge, Camille F. Gravel, Jr., Alexandria, Alfred L. Scanlan, Washington, D. C., Thomas A. Rayer, New Orleans, Shea & Gardner, Washington, D. C., Paul M. Hebert, Baton Rouge, for intervening defendants.

Jack P. F. Gremillion, Atty. Gen., Bailey E. Chaney, Baton Rouge, for appellees.

BARHAM, Justice.

By decree rendered in this case on October 19, 1970, we declared Acts 223 and 314 of 1970 unconstitutional, permanently restrained the state officers from acting in any way to implement these acts, and issued a restraining order, effective immediately, pending the finality of the judgment. Because this matter involves the unconstitutionality of statutes authorizing the expenditure of millions of dollars of public funds, we deemed it to be to the best interest of the state to give a decision at that time without waiting to reduce to writing the reasons which impelled us to that decision. We now hand down the written reasons for our decree.

Plaintiffs, taxpayers of the state, filed this suit attacking Acts 223 and 314[1] of 1970 which authorize the expenditure for this fiscal year of $10,000,000.00 in tax funds "for the purchase by the State of Louisiana of secular educational services from teachers employed by nonpublic schools". They sought an injunction restraining the defendants, the State Treasurer and Superintendent of Education, from implementing the legislation by ex-

1. Act 223 is the enabling act and Act 314 the appropriating act. Our discussion will bear principally upon the former, for the latter stands or falls on our decision as to the former.

penditure of funds or other acts. The trial court issued a rule nisi, and the defendants answered, alleging the validity of the legislation. Others, including teachers in non-public schools and taxpayers, intervened. By stipulation documents were made a part of the record and other facts agreed upon. All parties applied to this court for certiorari, and because of the urgent public interest we exercised our plenary powers so that we could review the record and decide the issues.

Act 223 provides that the State Superintendent of Education shall "Make contracts for the purchase of secular educational services directly with teachers of secular subjects". It further provides in Section 3: "(c) 'Purchase of Secular Educational Services' means the purchase by the Department of Education, from a school teacher, of services in teaching secular subjects to children enrolled in approved nonpublic schools. Payments shall be made directly to the teacher and such payments shall not exceed the State scale paid to teachers in the public school system". "Secular Subject" is any course of study in the curricula of the public schools but not courses of study teaching religious beliefs or any form of worship of a sect or religion. "Approved Nonpublic School" is defined as a non-profit elementary or secondary school in the state offering education in any grades from one through 12 which complies with the requirements of

the compulsory school attendance law and which is supported predominantly "from funds or property derived from nongovernmental sources".

Funds to be disbursed for the purchase of secular teachers in non-public schools are to come from a special fund, and funds dedicated to public schools cannot be used to implement the act. If the appropriation to the "Secular Educational Services Fund" is insufficient to pay the total teacher contracts, then they are to be paid in the proportion to which the total amount of each contract bears to the moneys available in the fund.

The act states that approximately 15 per cent of our grade and elementary school pupils are in non-public schools, and the stipulation states that 69 per cent of the eligible non-public schools in Louisiana are religious-related while 31 per cent are non-religious in character. The stipulation further reflects that 6756 teachers are eligible for funding, and that the percentage of teachers eligible in religious-related schools is 78 per cent and in non-religious schools 22 per cent.

To summarize, the act provides that the State of Louisiana shall pay qualified teachers of approved non-public schools, largely religious, an amount equal to, but not surpassing, that which teachers with similar qualifications in public schools would receive, but that such payments are

to be made for the teaching of only secular subjects.

■ The thrust of plaintiffs' challenge to the constitutionality of these acts is that the legislation violates Article 1, Section 4; Article 4, Section 8, and Article 12, Section 13, of the Louisiana Constitution of 1921.[2] They urge that if the court needs to look further, the legislation is in violation of the establishment clause of the First Amendment to the United States Constitution.[3]

∗. We have no need to resort to the establishment and free exercise clauses of the First Amendment to the United States Constitution for a determination of the issues before us since our Article 1, Section 4, embodies those provisions in full and expounds upon them in greater detail. Our decision is based exclusively on the applica-

tion of our Louisiana constitutional provisions.

A bifurcated but inextricably interwoven proposition is presented to the court—aid to religious private schools and aid to non-religious private schools; and the approach to each issue will be partly overlapping and determinative of the other. We would pose first the question of whether our state Constitution permits the appropriation of public funds to pay the salaries of teachers employed in and by *sectarian schools* for the teaching of secular subjects, and permits the establishment of administrative machinery to monitor instructional materials, to formulate and supervise contracts of employment, to disburse funds, and to verify that the teachers' services purchased are free of sectarian religious content.

Our state Constitution contains three prohibitions relating to legislation of the

2. The pertinent provisions of the Louisiana Constitution are:
    "Every person has the natural right to worship God according to the dictates of his own conscience. *No law shall be passed respecting an establishment of religion, nor prohibiting the free exercise thereof;* nor shall any preference ever be given to, nor any discrimination made against, any church, sect or creed of religion, or any form of religious faith or worship." Art. 1, Sec. 4. (Emphasis here and elsewhere has been supplied.)
    "No money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such, and no preference shall ever be given to, nor any discrimination

made against, any church, sect or creed of religion, or any form of religious faith or worship. No appropriation from the State treasury shall be made for private, charitable or benevolent purposes to any person or community; provided, this shall not apply to the State Asylums for the Insane, and the State Schools for the Deaf and Dumb, and the Blind, and the Charity Hospitals, and public charitable institutions conducted under State authority." Art. 4, Sec. 8.
    "No appropriation of public funds shall be made to any private or sectarian school. * * *" Art. 12, Sec. 13.
3. The First Amendment to the United States Constitution provides in part: "Congress shall make no law *respecting an establishment of religion, or prohibiting the free exercise thereof * * *.*"

type we are considering: (1) The prohibition against the enactment of any law "respecting an establishment of religion", (2) the prohibition against the expenditure of any money from public sources, *directly or indirectly*, "in aid" of any religious group or "in aid" of anyone engaged in the capacity of minister or teacher of such group, and (3) the prohibition against appropriating funds to "any private or sectarian school". We are of the opinion that the present acts violate all of these Louisiana constitutional prohibitions.

■■ The prohibition of Article 1, Section 4, against the enactment of laws "respecting an establishment of religion" forbids not only the full establishment of a religion or religions, but also prohibits legislative action either advancing or inhibiting religion.[4] The great similarity of the establishment clause of our Constitution and that of the United States Constitution allows us to use the United States Supreme Court interpretations of the federal clause as an aid for interpreting our own.

■ Two United States Supreme Court cases are relevant to a determination of the constitutionality of these acts under our establishment clause. The first is Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), which reviewed the constitutionality of refunding bus fare to parents of children in non-public schools.

4. The historical background of the First Amendment to the United States Constitution is a valuable source for study in understanding our own establishment provision. Mr. Justice Rutledge dissenting in Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), stated: "No provision of the Constitution is more closely tied to or given content by its generating history than the religious clause in the First Amendment. It is at once the refined product and the terse summation of that history." Although it may be argued that the First Amendment forbade congressional interference with state regulation of religious rights or perhaps even state establishment of a religion, it has been made applicable to the states. The members of the United States Supreme Court through many pronouncements in majority, concurring, and dissenting opinions have recognized that the final version of the First Amendment was an evolvement intending to forbid all laws respecting an establishment of religion, and was deserv-

ing of a broad interpretation "in light of its history and the evils it was designed forever to suppress". Everson v. Board of Education, supra; McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). See also Mr. Justice Black's majority opinions in Everson v. Board of Education, supra, and Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), for historical background and a correlation of the First Amendment to state prohibitions against church and state relations. When the establishment clause and the free exercise clause, either of the United States Constitution or of our Constitution, are read together, it is clear that their purposes are tridental: (1) To protect the individual in his, and from others', religious beliefs or non-beliefs; (2) to protect the individual from the coerced deprivation of his private means for the support and aid of religious activities or espousals; and (3) to insure civil government without intrusion or domination by sectarian orders.

The court stated that there was every reason to give to the clause prohibiting the establishment of religion the same broad interpretation previously employed by state courts in interpreting their state establishment clauses. The court in Everson held that the clause meant, at least, that: " * * Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. *No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion.* Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa. * * * " (Emphasis here and elsewhere has been supplied.)

The second pertinent United States Supreme Court case, Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), held constitutional a New York law which authorized the lending of textbooks to grade and elementary pupils in all schools. After quoting with approval the "no aid" test set forth in Everson, it stated: " * * * 'The constitutional standard is the separation of Church and State. The problem, like many problems in constitutional law, is one of degree.' Zorach v. Clauson, 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952). See McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). Based on Everson, Zorach, McGowan, and other cases, Abington Tp. School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), fashioned a test * * *. 'The test may be stated as follows: what are the purpose and the primary effect of the enactment? If *either* is the advancement or inhibition of religion, then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion. * * *'" This is commonly referred to by writers as the "purpose and primary effect" or "accommodation" test.

Running throughout all of these cases is the general concept or test of neutrality between state and church. The United States Supreme Court has used three tests for interpreting the establishment clause: "No aid", "purpose and primary effect", and "neutrality". The language in Allen seems to approve all three tests, but it is con-

tended that Allen applied only the "purpose and primary effect" test. Regardless of the principles and tests set forth in Allen, the court found that *"no funds* or books are furnished *to parochial schools,* and the *financial benefit* is *to parents and children,* not to schools", and held that although free books could encourage some children to attend sectarian schools, this was not "an unconstitutional degree of support for a religious institution".

Although there is no dearth of language in the Everson and Allen decisions, the two cases stand for the simple proposition that legislation affording pupil financial benefits which do not relieve sectarian schools of any of their financial obligations is not violative of the establishment clause even though there is a possibility of indirect benefit flowing to the sectarian schools. There are other cases considering the federal establishment clause where public spending is not at issue but which are helpful in an understanding of the constitutional question: When does public expenditure which benefits sectarian institutions infringe upon the establishment clause?

Walz v. Tax Commission of City of New York, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), is the latest expression of the United States Supreme Court, and in considering church tax exemptions the court said there: "* * * the questions are whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement. *Obviously a direct money subsidy would be a relationship pregnant with involvement* and, *as with most governmental grant programs, could encompass sustained and detailed administrative relationships for enforcement of statutory or administrative standards* * * *." 5

Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), considered the law permitting the absence of students from public schools for sectarian study. The court stated: "* * * Government may not finance religious groups nor undertake religious instruction *nor blend secular and sectarian education* nor use secular institutions to force one or some religion on any person. * * *"

The holding in Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), prohibiting a non-denominational prayer in public schools, the holding in Abington

5. Walz erroneously stated that the loan of books in Allen relieved churches of an "enormous aggregate cost for those books". Walz bottoms that conclusion on a mistaken finding of facts. It was specifically stated in Allen that "the financial benefit is to *parents and children,* not to schools". Allen noted (footnote 6,

392 U.S. p. 244, 88 S.Ct. p. 1927) that the record contained no evidence that "any of the private schools in appellants' districts previously provided textbooks for their students", and quoted from the commissioner of education that "Nonpublic schools rarely provide free textbooks".

School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), forbidding Bible reading in public schools, and the holding in People of State of Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), prohibiting use of public school buildings for sectarian study in free periods, are positive holdings against "blend-[ing] secular and sectarian" activities in public buildings and with public education. There can be no distinction between blending sectarian and secular activities at public schools and blending these activities at private schools which are publicly supported.

It is argued by defendants and intervenors that the payment of teachers' salaries falls into the same category as payment of pupils' textbooks and transportation found constitutionally permissible in the Everson and Allen cases. To the contrary, there is a great difference. We readily conclude from the findings of fact within the act that the Legislature has found that the sectarian schools are *obligated* to furnish teachers and revenue for teachers' salaries in those schools. The Legislature's primary basis for funding non-public schools is that the financial crisis in those schools has forced them into a non-competitive position with the public schools for the employment of qualified teachers. Moreover,

those cases concerned support for non-essentials to education. Education, including non-public education, can be provided without transportation and books, for education is pedagogic. One of the greatest schools of all times existed without the benefit of books, buildings, and transportation facilities—the Socratic school. It is to be seen, then, that these acts fund sectarian schools by relieving them of their first and primary financial burden, and differ greatly from legislative funding of ancillaries to education which are non-obligatory upon the schools and which are of monetary expense only to the pupils and their parents.

The findings of fact which preface the act before us, after declaring that a financial crisis exists in both public and non-public schools, state in part that "nonpublic schools have been reduced to a noncompetitive position for the employment of qualified teachers of secular educational subjects", and that "the State of Louisiana has the right, the responsibility, the duty and the obligation * * * to provide financial assistance to qualified teachers of secular subjects in nonpublic schools, by the purchase of their secular educational services".

Thus it may be seen that if we apply only the "purpose and primary effect"[6]

---

6. Jurists and legal writers find Everson, Zorach, Engel, McCollum, Schempp, Allen and Walz to stand for many different propositions. We do not here adopt the

test set forth in Schempp and Allen, we would find that the purpose of this act is to subsidize sectarian schools, the closing of which would cast an increased student burden upon the public school system. The Legislature proposes to expend public funds to assure the continuation of these sectarian schools. This would assure the continued advancement of the faiths they represent, which, as said in Walz, is their "affirmative if not dominant policy".

We do not look to the conduit used for furnishing financial aid to sectarian institutions. We are concerned only with whether through that conduit the sectarian institution is the beneficiary of that aid, whether the purpose and effect of that aid are to relieve the sectarian institution of a financial responsibility, whether that aid will further the sectarian interest of that institution, and whether that aid will bring about a forbidden involvement and entanglement of church and state.

The *primary effect* of legislation is not always what the legislators believe and expound in their statements of purpose. The primary effect of this legislation would transform a single, centralized public school system into a dual one incorporating nonpublic schools. There will emanate from this double-headed system a new species of state-financed and state-regulated education.

cation. These acts attempt to separate the secular from the religious services rendered by sectarian schools and place the secular segment under a state-administered school program. No one would contend that at this point under the particular acts total control of religious schools is vested in the state. However, it is necessary to conclude that the constitutionally improper degree of entanglement and pregnant involvement is effectuated under this legislation.

The purchase of secular instruction from sectarian schools sets up unavoidably confrontations and conflicts between public and religious institutions and between public administrators and religious administrators over the boundary between secularity and sectarianism in instruction. In order to confine public funding to secular teaching, conscientious public officials must engage in a concentrated program of inspection and monitoring. Perhaps these officials can totally disassociate the secular from the sectarian as applied to their program, but it is well to note that after almost 200 years the courts have found that dilemma persisting. But the attempt to find and maintain the lines of separation would itself require excessive state involvement in religion. The policing required to carry out the legislative intent here would set religious groups and state officials at odds

---

"purpose and primary effect" test as the proper test to be applied. We find it, however, to be the one most favorable to

the defendants' position, for we easily conclude under the "no aid" and "neutrality" tests that these acts fall.

over the delineation of what each considers proper lines of demarcation. With noble fervor on the part of each, one would press for a high level of religious influence and the other for a total vacuum surrounding the secular program.

If the state is not intrusive upon and limiting of the free administration of sectarian institutions, secularity cannot be assured, and advancement of religion will ensue. And if the state acts zealously to guard the establishment principle and the legislative intent, its entanglement and involvement will most surely inhibit, deter, alter, and impinge upon religious freedom. The conflicts of state and religion which will emanate from the administration of this act are the very evil sought to be avoided by Article I, Section 4, of our Constitution. Those who now seek Caesar's gold will one day seek redress from the payment to Caesar of that which invariably comes with his gold, his control.

We believe these acts furnish that subsidization and involvement which are repugnant to the Louisiana Constitution, Article 1, Section 4.

■ Since much of the argument before us revolved around the economic advantage to the state and the serving of its economic interests, we must note that in considering the constitutionality of legislation involving the basic rights preserved in our Constitution such as those at issue, we may not look to the wisdom or the reasonableness of the legislation. These basic rights are not subject to modification by legislative action or majority approval; they are subject only to interpretation and application by the courts or to change by the constitutional amendment process. The finding of a crisis by the Legislature will not justify legislative encroachment in this field. The government cannot finance religious institutions even with the assurance that such a program will produce a smaller over-all tax burden or avoid new and onerous state responsibilities.

We would be remiss if we did not state that, contrary to the dissenting opinion which has been previously filed, this act does not provide *supplemental* pay as that term is ordinarily used. The act permits the payment from state funds to non-public school teachers, regardless of the amount received from other sources as salary, an amount equal to the salaries of teachers of the same qualifications in the public school system. Although the initial appropriation is $10,000,000.00, on the basis of the facts in this record and the salary schedule of public school teachers in Act 397 of 1968 we estimate that full implementation as permitted by the act would cost the taxpayers well in excess of $50,000,000.00 annually.

Our lengthy discussion of the application of Article 1, Section 4, does not mean that it is the primary basis for our holding of unconstitutionality. We have felt obligated

to meet the contentions of the parties as presented to us, and they relied greatly on this provision. However, these acts are in violation of two other provisions of the Louisiana Constitution. The other constitutional prohibitions buttress the conclusion we have reached above, and the discussion above buttresses a conclusion that these other prohibitions make the acts before us unconstitutional.

All of the United States Supreme Court cases and many of the state cases which have decided issues similar to that confronting us were concerned with only one prohibition against church-state involvement, the prohibition against the enactment of legislation respecting the establishment of religion; but we in Louisiana are more limiting of governmental involvement in religious activities, in the expending of public funds, and in aiding non-public schools. We note several recent cases arising in other states in both federal and state courts. Several of these are now pending in the United States Supreme Court.[7] We, like the Massachusetts court in Opinion of the Justices, 258 N.E.2d 779 (1970), find that because of special provisions contained in our Constitution the cases arising in Pennsylvania, New Hampshire, Rhode Island, Michigan and Maine are inapposite to our decision. That court said:

" * * * The language unquestionably was designed to preclude entirely aid to all nonpublic institutions from appropriated public funds with minor exceptions not here relevant.

" * * *

" * * * It is still applicable despite changed conditions and probably somewhat different public attitudes. The existence of an emergency * * * cannot alter the unequivocal terms of art. 46, § 2 [prohibition against expenditure of public funds to any private school]. It constitutes a binding constitutional restraint upon the General Court and upon us until and unless it is changed by some method permitted by the Constitution of the Commonwealth.

"Opinions from other States, with different constitutional provisions, are not controlling. * * * "

We are further of the opinion that any United States Supreme Court decision

---

7. Lemon v. Kurtzman, 310 F.Supp. 35 (D.C.E.D.Pa.1969), prob. jur. noted 397 U.S. 1034, 90 S.Ct. 1354, 25 L.Ed.2d 646; Tilton v. Finch, 312 F.Supp. 1191 (D.C. Conn.1970), prob. jur. noted 399 U.S. 904, 90 S.Ct. 2200, 26 L.Ed.2d 558; DiCenso v. Robinson, 316 F.Supp. 112, stay order for appeal issued 399 U.S. 918, 90 S.Ct. 2225, 26 L.Ed.2d 785. See also the very recent decision of Johnson v. Sanders, on the docket of the United States District Court, District of Connecticut, —— F.Supp. —— (1970) in which a three-judge federal court held the purchase of secular educational services from private schools unconstitutional under the First Amendment of the United States Constitution.

founded solely upon the First Amendment of the United States Constitution would not be controlling of the case before us.

The second prohibition of our Constitution is found under Article 4 providing limitations upon the legislative power. Article 4, Section 8, provides: "No money shall ever be taken from the public treasury, *directly or indirectly*, in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such * * *."

We have previously stated that the act itself recognizes the financial obligation upon the religious sects for maintaining teachers in their educational institutions, and we recognize that this legislation would relieve the churches of the burden of this enormous aggregate cost. This is in contravention of the prohibition against giving "aid" directly or indirectly to any church or religious sect or denomination. It is immaterial under this clause of Article 4, Section 8, that the aid to the religious institution is channelled through the teachers. The obvious effect and purpose are to aid the religious sects in maintaining institutions which teach the tenets of their faith as well as secular subjects.

In support of defendants' contention that teachers of secular subjects in sectarian schools may receive financial support although the school itself could not be the beneficiary, an attempt is made to interpret the language of the provision so that the word "teacher" means "teacher of religion". We cannot accept this unsound interpretation, but in any event this contention cannot influence our decision since we have already concluded that the act provides substantial aid to religious institutions.

We must construe Article 4, Section 8, as a total provision which particularly forbids the Legislature from expending any funds directly or indirectly in aid of any religious institution. That section provides a specific limitation upon using public funds for the support of any non-public institution.[8]

The cases of Borden v. Louisiana State Board of Education, 168 La. 1005, 123 So. 655, and Cochran v. Louisiana State Board of Education, 168 La. 1030, 123 So. 664, involved the constitutionality of legislation authorizing the lending of free school books to all Louisiana children. We have deliberately deferred a discussion of them because the United States Supreme Court affirmed these decisions in Cochran v. Louisiana State Board of Education, 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913 (1930), on a

8. The final sentence of Article 4, Section 8, provides: "No appropriation from the State treasury shall be made for *private, charitable* or benevolent purposes to any person or community; provided, this is not applied to the State Asylums for the Insane, the State Schools for the Deaf and Dumb, and the Blind, and the

basis other than separation of church and state.[9]

The Borden and Cochran cases were decided by the Louisiana Supreme Court under basically the same state constitutional provisions with which we are now involved. This court found that the lending of books to all pupils in all schools served a public purpose, and that since it was aid to *the pupil and the pupil's parents*, it was not violative of the prohibition against aid to private and sectarian schools which is condemned in the several constitutional provisions. The pertinent language in Borden was adopted and repeated by the United States Supreme Court in affirming Cochran: " * * * The schools, however, are not the beneficiaries of these appropriations. *They obtained nothing from them, nor are they relieved of a single obligation, because of them.* The school children and the state alone are the beneficiaries. * * "

We have found that because the payment of teachers' salaries in sectarian schools relieves the various religious faiths of enormous financial obligations and is aid to religious institutions, the Borden and Cochran cases, like Everson and Allen, are not applicable.

▬ Finally, the third prohibition against funding non-public schools is contained in Article 12 of the Louisiana Constitution. That article is titled "Public Education", and its first section provides in part: "The legislature shall provide for the education of the school children of the state. *The public school system shall include all public schools and all institutions of learning operated by state agencies.*" Section 13 of Article 12 is explicit: "No appropriation of public funds shall be made to *any* private or sectarian school. * * *" The dissent previously filed has concluded that an amendment to this provision, which, among other things, changed the language from "used for the support of" to "made to", effected a vital change which would allow indirect public funding of private and sectarian schools through the payment of teachers' salaries. We cannot accept this conclusion, for such a construction would disregard the purpose of Article 12 and other constitutional provisions. The prohibition is against any appropriation—direct or indirect—to any non-public school.

We have expressed in Article 12 of our Constitution our dedication to a public-supported public school system operated by state agencies and providing free education to the children of our state. Public funds for public education shall be expended only in the furtherance of *"public*

Charity Hospitals, and *public charitable institutions conducted under State authority.*"

9. When this case was considered by the United States Supreme Court, that court had not made the First Amendment applicable to the states through the Fourteenth Amendment.

*schools*". The prohibition under Article 12 of the Louisiana Constitution is all-determinative of both propositions—that is, aid to private sectarian and aid to private non-sectarian schools. We do not require, for it would be constitutionally impermissible, that educational pursuits be followed only in public institutions of learning; but for those who cannot afford or do not choose private or sectarian education, we have provided free public education through one institution, the public school system, and all of every persuasion and faith may partake of it. We are aware that private education has rendered a valuable service to this state and this country. So long as it exists as independent educational facilities without governmental control, it will continue to render that valuable service. Indeed, were all education coerced through governmental systems, there could be danger of indoctrination and regimentation, and the present healthy diversity of educational institutions would be eliminated.

We have concluded that the purchase of secular teacher services by payment of sectarian teachers' services is aid to religious institutions, and that Everson, Allen, Borden, and Cochran do not extend to this legislation. We therefore hold that this legislation is unconstitutional under Article 1, Section 4, and Article 4, Section 8. Although the demarcation line between church and state is often difficult to ascertain,

the activity permitted by this legislation would be that giant "second step" which would bring government into an involvement and entanglement forbidden by the establishment clause of our Constitution and forbidden by the constitutional provision restricting legislative spending of public moneys. We further hold that this legislation violates Article 12, Section 13, which is an explicit and unambiguous constitutional answer to all of the questions presented here.

The less restrictive guidelines laid down in some of the United States Supreme Court cases, such as the "purpose and primary effect" test, are not determinative of this Louisiana legislation. Because of our particular constitutional provisions the only test which need be applied for a determination of whether public funding may be made available to any non-public school, sectarian or non-sectarian, is whether such funding contributes directly or indirectly *any aid* to those schools. This legislation fails to meet this "no aid" test.

Our previous decree is repeated for convenience:

IT IS ORDERED, ADJUDGED AND DECREED that Acts 223 and 314 of 1970 are declared unconstitutional.

IT IS FURTHER ORDERED that there be judgment herein in favor of the plaintiffs, Sidney A. Seegers et al., and against the defendants, Mary Evelyn Par-

kcr, Treasurer of the State of Louisiana and William J. Dodd, Superintendent of Education for the State of Louisiana, and the defendants are ordered and permanently restrained from administering, acting under, or expending funds under Acts 223 and 314 of 1970.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that pending the finality of this judgment, the said defendants are hereby restrained from expending any funds or doing any act to carry into effect the provisions of said acts.

SUMMERS, Justice (dissenting).

This is a taxpayer's suit challenging the constitutionality of Louisiana's Secular Educational Services Act of 1970 providing for the purchase by the State of secular educational services from teachers employed by nonpublic schools and establishing procedures for the execution and regulation of contracts for such purchases.

Plaintiffs seek an injunction restraining the State Treasurer and Superintendent of Education from making any payments under the Act or the implementing legislation appropriating $10,000,000 for the current school year. See Acts 223 and 314 of 1970, Appendix A (La.R.S. 17:1321 et seq.). The trial court ordered defendants to show cause why the Acts should not be declared unconstitutional, and defendants answered seeking to uphold the validity of the Acts. Other citizens, taxpayers and teachers in qualified nonpublic schools intervened in support of the laws' constitutionality.

All facts to be considered in deciding the question were stipulated in the trial court; and when all parties applied for certiorari, we ordered the record up under our plenary powers because of the avowed "crisis" in the State's educational program. State ex rel. Pearce v. Democratic State Central Committee, 229 La. 556, 86 So.2d 191 (1956); Long v. Martin, 194 La. 797, 194 So. 896 (1940).

Findings of fact, a declaration of necessity and a statement of public policy are contained in the basic Act (223 of 1970). It declares in grave and emphatic terms that a "crisis" exists with respect to the education of children in elementary and secondary schools as a result of unprecedented rising costs, the demand for improvement in the quality of education and the demand that more opportunities be made available for educating Louisiana children, including those being educated in nonpublic schools.

Certain of the financial aspects of this crisis in education in nonpublic schools are declared by the statute to be the direct result of state and local government taxation to support pay increases for public school teachers and to defray the costs of improved public school facilities. As a result, nonpublic schools have been reduc-

ed to a noncompetitive position for the employment of qualified teachers of secular educational subjects. In some of its aspects the crisis in education, according to the legislative finding, is national in scope. Examples of this are stated to be the demand for excellence in all programs of instruction, the demand for the creation and implementation of innovative methods and techniques of teaching and the demand for improvement of teacher salary schedules to assure a high level of quality within the teacher corps itself.

Acknowledging that Louisiana's literacy rate is among the lowest in the Nation, the legislation recognizes the need for continued concentrated efforts to raise the State's educational level. It finds that elementary education is a public welfare purpose and that nonpublic education, through providing instruction in secular subjects, makes an important contribution to that purpose. Thus, it is concluded, this purpose may in part be fulfilled through governmental contracts for secular educational services provided by teachers in nonpublic schools.

Attendance of children at nonpublic schools constitutes compliance with the Louisiana Compulsory School Attendance law [1] by the Act's terms; and nonpublic schools in the State today, as during past years, bear the burden of educating fifteen percent of all elementary and secondary school pupils, a significant educational and economic contribution.

The Act declares, moreover, that it is in the public interest that all Louisiana children receive the best education its citizens can provide; and in order to accomplish this objective, the State has the right, the responsibility, the duty and obligation to provide financial assistance to qualified teachers of secular subjects in nonpublic schools by the purchase of their secular educational services.

The Superintendent of Education is charged with the administration of the Act, and he may contract for the purchase of secular educational services from school teachers teaching secular subjects to children enrolled in approved nonpublic schools. Payment under the Act is to be made directly to the teacher, not exceeding

1. La.R.S. 17:236 defines a "school" as contemplated in the Compulsory School Attendance law as follows: "For the purposes of this Chapter, a school is defined as an institution for the teaching of children, consisting of an adequate physical plant, whether owned or leased, instructional staff members and students. For such an institution to be classified as a school, within the meaning of this Chapter, instructional staff members shall meet the certification requirements established by the State Board of Education. In addition, any such institution, to be classified as a school, shall have a minimum of fifty students enrolled as bona fide pupils and shall operate a minimum session of not less than one hundred eighty days."

the State scale paid to teachers in the public school system.

The "secular subjects" contemplated in the program mean any course of study in the curricula of the public schools, including, but not necessarily limited to, the teaching of mathematics, language arts, general and physical sciences, physical education, art and music, crafts and trades, home economics, or any other course of study in the curricula of the public schools, other than those involving the teaching of religious beliefs or any form of worship of any sect or religion.

A special fund is established to administer the Act from which all expenses and disbursements are required to be made.

Rules and regulations authorized to be promulgated in connection with the Act provide that textbooks and all other instructional material used in secular courses shall be completely nonsectarian in nature. Payments are to be made to teachers holding a valid Louisiana teacher's certificate and meeting all certification requirements of the State Board of Education. No teacher shall be paid except for the time spent teaching secular subjects, and no teacher who teaches religion on any school day can receive pay for that day. Likewise, services rendered while performing administrative duties at nonpublic schools are not compensable under the Act. In order to qualify, a nonpublic school must be sup-

ported "predominantly" from funds or property derived from nongovernmental sources. Thus teachers' pay, like all other activities of nonpublic schools, are required to be financed "predominantly" from nongovernmental sources.

Benefits to nonpublic school teachers are restricted to the salary supplement. No insurance, pension, training or other fringe benefits are available to them under the Act.

The stipulation of fact sets forth that sixty-five percent of the nonpublic schools are religious related and thirty-one percent are nonreligious. A substantial majority of the religious related schools of the State are under the supervision and control of the Roman Catholic Church; and Catholic religious courses are taught in those schools by priests, brothers, nuns and laymen, Catholic and non-Catholic, who compose the faculties of those schools. In other religious related schools clergymen and laymen of various faiths compose the faculties.

Plaintiffs contend the Acts violate Article I, Section 4; Article IV, Section 8 and Article XII, Section 13, of the Louisiana Constitution and the First and Fourteenth Amendments to the Federal Constitution.

I.

Article I, Section 4, of the Louisiana Constitution contains the State's Establish-

ment Clause, the source of which is the almost verbatim language of the Establishment Clause of the First Amendment to the Federal Constitution. These constitutional provisions also embody the nearly identical Free Exercise Clauses of both Constitutions, but, since the Free Exercise Clauses have not been urged in argument or brief, I am confident they are not relied upon to sustain plaintiffs' position. Accordingly, before considering the other State constitutional provisions relied upon by plaintiffs, I will consider the Act in the light of the Establishment Clauses of the State and Federal Constitutions. I do this at the outset, for the principles underlying these enactments to a certain extent pervade all issues presented in this suit.

The pertinent part of Article I, Section 4, of the State Constitution advanced in support of plaintiffs' position declares, "No law shall be passed respecting an establishment of religion * * *", and the Federal First Amendment Clause is, "Congress shall make no law respecting an establishment of religion * * *."

The First Amendment Establishment Clause has been made applicable to the states under judicial decisions which have been repeatedly reaffirmed beginning with Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Both establishment clauses, therefore, must be viewed in the light of the principles announced by the Federal Supreme Court in interpreting the Federal Establishment Clause. For under the Supremacy Clause of the Federal Constitution, all laws must, at the very least, conform with the mandates implicit in the Federal Establishment Clause.

Louisiana was in the vanguard of states which sought, with public funds, to improve education in public and nonpublic schools alike. In 1928 it appropriated money for the purchase of schoolbooks for the use of children in all the State's schools, public, religious and private. These acts were upheld by this Court against attacks that they were violative of the State and Federal Constitutions in Borden v. Louisiana State Board of Education, 168 La. 1005, 123 So. 655 (1929) and Cochran v. Louisiana State Board of Education, 168 La. 1030, 123 So. 664 (1929), the latter case having been affirmed by the Supreme Court of the United States in Cochran v. Louisiana State Board of Education, 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913 (1930). Mr. Chief Justice Hughes, writing for the United States Supreme Court, adopted the language of Mr. Justice Rogers, the organ of this Court, when he wrote:

One may scan the acts in vain to ascertain where any money is appropriated for the purchase of school books for the use of any church, private, sectarian, or even public school. The appropriations were made for the specific purpose of purchasing school books for

the use of the school children of the state, free of cost to them. It was for their benefit and the resulting benefit of the state that the appropriations were made. True, these children attend some school, public or private, the latter, sectarian or nonsectarian, and that the books are to be furnished them for their use, free of cost, whichever they attend. The schools, however, are not the beneficiaries of these appropriations. They obtain nothing from them, nor are they relieved of a single obligation because of them. The school children and the state alone are the beneficiaries. It is also true that the sectarian schools, which some of the children attend, instruct their pupils in religion, and those books are used for that purpose, but one may search diligently the acts, though without result, in an effort to find anything to the effect that it is the purpose of the state to furnish religious books for the use of such children * * * What the statutes contemplate is that some books that are furnished children attending public schools shall be furnished children attending private schools. This is the only practical way of interpreting and executing the statutes, and this is what the state board of education is doing. Among these books, naturally, none is to be expected, adapted to religious instruction.

It was 1946 before the United States Supreme Court again decided a case pre-senting the same issue. Mr. Justice Black authored the majority opinion in a case involving the constitutionality of a New Jersey statute authorizing the reimbursement to parents of money expended by them for the bus transportation of their children on regular buses operated by the public transportation system. Part of this money was to pay the transportation of children attending Catholic parochial schools where children were given instruction in both secular and religious subjects. The act was challenged as violating the Due Process and Establishment Clauses of the Federal Constitution. See Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). In declaring the contested Act constitutional, the Court recognized that the lessons of history made the need for separation of Church and State abundantly clear to the framers of the Constitution. This doctrine of separation, which the Establishment Clause supports, however, was not to be applied so severely that in protecting the citizens against state-established churches, the courts might "inadvertently prohibit New Jersey from extending its *general state law benefits* to all its citizens without regard to their religion or belief." (Emphasis added.)

Observing that the denial of this assistance to church schools might make it more difficult for them to operate, the Court remarked that it was obviously not the purpose of the Establishment Clause to

hinder religious schools, since the State had no more right than the church to educate the State's children. The Establishment Clause required "the state to be a *neutral* in its relation with groups of religious believers and non believers; it does not require the state to be their adversary. State power is no more to be used to handicap religions than it is to favor them."

Until 1968 Everson remained the only United States Supreme Court case among the few establishment decisions which touched so directly upon church related education.

The wholesome "neutrality" of which the Court speaks in Everson was in the interim to be defined more specifically in Abington School District v. Schempp, 374 U.S. 203, 222, 83 S.Ct. 1560, 1571, 10 L.Ed.2d 844 (1963), where the Court again held that the Establishment Clause withdrew legislative power respecting religious belief or the expression thereof. To decide if this requirement is met, the Court formulated this basis for the inquiry:

> The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a *secular legisla-*

*tive purpose* and *a primary effect that neither advances nor inhibits religion.* (Emphasis added.)

Then, in Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), the Court had before it the constitutionality of an Act giving textbooks to children in religious schools. In applying the Schempp test the Court held that the federal constitutional provisions as to establishment and free exercise of religion were not violated, since (1) the statute merely made available to all children the benefits of a general program to lend schoolbooks free of charge; (2) books were furnished at the request of the pupils, and ownership remained, at least technically, in the State; (3) no funds or books were furnished to parochial schools, and the financial benefit was to the parent and the children, not to schools; (4) only secular books, not religious books, could receive approval for loans; and (5) the statute was not alleged in any way to have coerced the plaintiffs as individuals in the practice of their religion.

Thus, the constitutional standard set by the First Amendment Establishment Clause and these cases is separation of Church and State. This problem, like many problems in constitutional law, is one of degree. Board of Education v. Allen, supra; Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952). See McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6

L.Ed.2d 393 (1961). The tests established by the cases are not easy to apply, but they require at least "neutrality" by the State in its program of assistance; that the program be "general", not aimed at or against any group or sect; and, finally, there must be a "secular legislative purpose and a primary effect that neither advances nor inhibits religion."

In applying these tests to the case at bar, I start with the fundamental and elementary principle long a part of our substantive law and without a proper respect for which the concept of separation of power might have a precarious existence in our constitutional scheme. Announced by Mr. Chief Justice Marshall in 1810 the principle retains its vitality and strength to this day; it is:

> The question, whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and

strong conviction of this incompatibility with each other. Fletcher v. Peck, 10 U. S. 87, 3 L.Ed. 162 (1810).

In adjudicating the issues in the instant case, recognition must also be given to the Louisiana requirement that any act of the legislature is presumed to be constitutional and that the Legislature acted only after a thorough investigation and upon a finding that the interest of the public required the legislation in question. Buras v. Orleans Parish Democratic Executive Committee, 248 La. 203, 177 So.2d 576 (1965) ; Banjavich v. Louisiana Licensing Bd. for Marine Divers, 237 La. 467, 111 So.2d 505 (1959) ; Board of Barber Examiners of Louisiana v. Parker, 190 La. 214, 182 So. 485 (1938). Those assailing the constitutionality have the burden of showing by clear and cogent evidence that the statute is unconstitutional. Everhardt v. City of New Orleans, 253 La. 285, 217 So.2d 400 (1969) ; Reynolds v. Louisiana Board of Alcoholic Bev. Con., 248 La. 639, 181 So.2d 377 (1966) ; Kansas City Southern Railway Co. v. Reily, 242 La. 235, 135 So. 2d 915 (1962). Moreover, any doubt must be resolved in favor of the validity of solemn expression of legislative will. Johnson v. Collector of Revenue, 246 La. 540, 165 So.2d 466 (1964) ; Police Jury of St. Charles Parish v. St. Charles Parish Waterworks Dist. No. 2, 243 La. 764, 146 So.2d 800 (1962) ; Orleans Parish School Bd. v.

Louisiana State Bd. of Ed., 215 La. 703, 41 So.2d 509 (1941).

Of course paying a supplemental salary to teachers in nonpublic schools is not reimbursement of bus fares to parents or furnishing schoolbooks to children in nonpublic schools; but the principle upon which one is justified is identical with the principle advanced to support the other, and no plausible distinction has been advanced which can be supported on the basis of the rules of law we have found to govern this case or, for that matter, in logic of reason, which would warrant approving one and rejecting the other. To begin with the statute is drawn, I believe, with a precise, indeed laborious, attention to every detail of the standards established by the United States Supreme Court.

First, there is a recognition in the Act that the State can support state schools without supporting nonpublic schools, but, because of the "crisis" found to exist, the aid accorded to teachers in nonpublic schools is considered essential to the State's objective in education. The program is voluntary and is given by the State without coercion of any kind. Teachers must request the salary supplement, they need not do so; and payments are made directly to them, the nonpublic school not being involved directly or otherwise in the payment. Benefits under the Act are available to all teachers in nonpublic schools without regard to whether they are reli-

gious or nonreligious. It is in fact an effort by the State to make its educational program more general than it would be if these nonpublic teachers were cut out of the assistance.

Although the funds paid teachers in nonpublic schools are for teaching subjects in church schools and nonsectarian private schools, each course taught must be secular in nature, free of religious coloring. Payment is carefully conditioned by the statute on the premise that no religion is taught for which compensation is sought. With these facts before us, it cannot be assumed, as plaintiffs' brief suggests, that school authorities are unable to prescribe studies which are truly secular and segregate the teaching of these subjects from religious studies, or that the teachers will not honestly discharge their duties by keeping religion out of secular studies. The answer to the claim that religion will be injected into secular studies is simply that the courts will be open to adjudicate this question when the facts demonstrate that this has taken place. I must conclude in considering this Act on its face that the courses taught by teachers receiving supplements under the Act are such that they are free of religious content and, therefore, that the State's funds will not be used to support religion. The Act commands that this be so. No payment is authorized for any moment of time devoted to teaching religion. The Act emphatically proscribes any

admixture of religious and secular teaching. To say that the contrary will occur would be conjecture and speculation.

The notion that church schools cannot provide secular education which is not permeated with religious teaching rests on two related themes—that church related education is one single enterprise, rendered religious by the atmosphere and the motivation of the educators, and that denominational schools employ teaching practices which impermissibly permeate all subject matter with religion. These assertions are conclusions of law stated as irrefutable factual presumptions neither justified nor supported by this record. See Valente, Aid to Church Related Education—New Directions Without Dogma, 55 U.Va.L.R. 579, 588 (1969). As the *Allen* Court reasoned, parochial schools pursue both sectarian and secular functions, and the secular function is constitutionally qualified for aid.

Courts have often recognized, and the facts before us support the view, that religious schools pursue two goals, religious instruction and secular education. In Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) the basis of the holding was that the State's interest in education by requiring compulsory attendance would be adequately served by reliance on the secular teaching that accompanies religious training in the schools maintained by the Society of Sisters. The proposition must be rejected, therefore, that all church related education constitutes religious education and must be disqualified from government aid.

Courts must take care that they do not, in the name of religious liberty, deny children the benefits of public spending programs for secular education because they exercise freedom of choice by attending private nonpublic schools, religious and nonreligious. Establishment Clause values will receive a full measure of protection if there are assurances that public funds expended to improve education generally will not subsidize religious instruction.

Moreover, the statute's purposes and effects make it clear that any assumption based upon judicial notice that all church education is permeated with a religious coloring would of necessity have to be made in direct opposition to these findings in the statute:

(f) That the elementary and secondary education of children is today recognized as a public welfare purpose; that nonpublic education through providing instruction in secular subjects, makes an important contribution to the achieving of such public welfare purpose; that the governmental duty to support the achieving of public welfare purposes in education may in part be fulfilled through governmental contracts for secular educational services provided by teachers in nonpublic schools.

Underlying the cases and the legislation under consideration, is the recognition that "private education has played and is playing a significant and valuable role in raising national levels of knowledge." Board of Education v. Allen, 392 U.S. 236, 247, 88 S.Ct. 1923, 1928, 20 L.Ed.2d 1060 (1968). A high quality of education is considered indispensable for achieving the kind of nation and the kind of citizenry we strive to create, and private schools do an acceptable job of providing the type of secular education which is in keeping with these aims.

Here no funds are paid to the school; the payment is made to the teacher and mailed to the teacher's home address. It is suggested that the school benefits, if not directly, indirectly from these payments, for it is relieved of paying the supplement. Aside from the fact that there is no evidence to support this speculation, the record more properly indicates that the purpose and effect of the payments is to provide an additional service to the children which they would not otherwise have available—a quality education maintained with teachers who receive pay commensurate with the pay received by public school teachers. As the Court observed in Di-Censo v. Robinson, 316 F.Supp. 112 (D. Rhode Island 1970): "The Salary Supplement Act will not relieve the parishes or parents of their escalating burden, but will temporarily enable parochial schools to compete for qualified teachers."

For Louisiana to find the funds required to maintain its present level of education, and at the same time provide the improved education it deems vital to the public welfare without using nonpublic school facilities, would require that it make an outlay of funds far beyond its present ability. Since it could not reasonably attain the secular ends the Act promotes without using nonpublic school facilities, it is not a derogation of Establishment Clause principles to use nonpublic sectarian or nonsectarian school facilities to promote these secular ends even if there should incidentally be a minimal support to those nonpublic schools. Horace Mann League v. Board of Education, 242 Md. 645, 220 A.2d 51 (1966), cert. denied, 385 U.S. 97, 87 S.Ct. 317, 17 L.Ed.2d 195.

The purpose and effect test announced in Abington School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) is fully satisfied in this case. The statute neither establishes nor abridges religion. Its purposes are announced and defined as: "a public welfare purpose", an effort to forestall a "crisis", a program to improve the State's "literacy" rate, the recognition that sectarian schools make a "significant educational and economic contribution", a program to promote the State's interest in "Louisiana children receiving the best education its citizens can provide". All are public, nonreligious, secular purposes. These, too, are "effects" which the Act

aims to achieve; they are "effects" which neither promote nor inhibit religion. "No one in the last third of the 20th Century can doubt that a program aimed at improving the quality of education in the schools is a matter of legitimate State concern." Board of Education of Central School District No. 1 v. Allen, 20 N.Y.2d 109, 281 N.Y.S.2d 799, 228 N.E.2d 791 (1967).

The problem of maintaining a decent quality of education in all its schools, public as well as nonpublic, is not peculiar to Louisiana. Pennsylvania enacted a statute in 1968. Pennsylvania Non-Public Elementary and Secondary School Act, No. 109, June 19, 1968; 24 P.S. (Purdon), Sec. 5601 et seq. In 1969 Connecticut and Rhode Island enacted, respectively, the Non-Public School Secular Education Act (Public Act 791) and the Teachers Salary Supplement Act (R.I.Gen.Laws Ann. § 15–51–3). In the same year, Ohio enacted the Supplementary Education Services Act (Ohio Rev.Code § 3317.06(H)). In 1970 two more States with large numbers of children in nonpublic schools passed basic assistance legislation; Michigan and New York (Michigan Teachers Salary Supplement Act, Mich.Stat.Ann. § 15.1919 [M.C. L.A. § 388.612 et seq.] and New York Mandated Services Act, Laws of 1970, ch. 138). Similar bills are also pending in a number of other State legislatures. In addition, these recent cases have upheld state aid to religious and secular institutions.

Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); Tilton v. Finch, 312 F.Supp. 1191 (1970); Lemon v. Kurtzman, 310 F.Supp. 35 (1970), prob. juris. Noted 397 U.S. 1034, 90 S.Ct. 1354, 25 L.Ed.2d 646 (1970).

Excessive involvement of the State in the affairs of nonpublic schools is guarded against in the statute by requiring that in order for a teacher to qualify the nonpublic schools must be "supported predominantly" from funds or property derived from nongovernmental sources. Involvement with the church or private school is further restricted by requiring payment directly to the teacher. Any inquiry into school operations is nothing more than that which has been required for many years under the Compulsory School Attendance Law. See footnote 1, supra, and Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

Based upon these considerations I do not find the Act to be inconsistent with the Establishment Clauses of the State or Federal Constitutions.

II.

The language of Article IV, Section 8, of the State Constitution which is invoked here in support of the contention that the Act is unconstitutional is to the effect that no money shall be taken from the public treasury "in aid of any * * * religion, or in aid of any * * * teacher thereof,

as such * * *" Nothing in this constitutional command prohibits the use of public funds to pay teachers. Payment is only denied to teachers of religion "*as such*". As I have already carefully pointed out, the Act painstakingly adheres to the requirement that public funds only be used for secular purposes to advance education. Throughout its content the use of public funds to aid religion is prohibited. Hence, no conflict with this State's constitutional provision is found in the Act, and the attack based upon this constitutional provision must fail.

### III.

Forty years ago when this Court decided Borden v. La. State Board of Education and Cochran v. La. State Board of Education, Article XII, Section 13, of the State Constitution set forth that "No public funds shall be used for the support of any private or sectarian school. * * *" In 1962 that provision was amended to provide that "No appropriation of public funds shall be made to any private or sectarian school * * *" Obviously, the constitutional restriction was relaxed when the language was changed from "shall be used for the support" to "shall be made". The meaning to be derived from this revision is that so long as the appropriation is not "made to" the private or sectarian school it may incidentally "support" such a school. If the statutes under consideration in the Borden and Cochran Cases could be held

not to violate this constitutional provision before revision, the Act before us today undoubtedly meet the requirements of today's constitution.

Clearly state "support" cannot extend to such a point that the strictures of the Establishment Clause are violated. Thus if, in helping to advance secular education, the religious school receives an incidental benefit, the program is not thereby rendered constitutionally infirm. It is a primary purpose and effect which is secular which is relevant to the constitutional question. Viewed in this light, the Act in contest is not contrary to Article XII, Section 13, of the Louisiana Constitution.

The solemn findings of the Legislature that the public welfare will be served by the program the Act proposes are entitled to great weight, uttered as they are in the shadow of the State's educational crisis. "While recitals of fact in a legislative Act may not be conclusive, a decent respect for coordinate branches of the government requires the courts to treat them as true until the contrary appears." Opinion of Justices, Me., 261 A.2d 58 (1970). And while I realize that the existence of a crisis does not justify changing the meaning of the Constitution, the existence of a crisis is certainly pertinent to a determination of whether a public purpose is present. Undoubtedly this carefully circumscribed program is designed to comply with both the Federal and State constitutional man-

dates, and the State is entitled to exert this effort in its struggle to meet its greatest problem. What the Constitution does not prohibit, the State is free to do. McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579 (U.S.1819). Teachers in nonpublic schools, private and religious alike, are constitutionally entitled to these funds so long as the primary purpose and effect is to serve secular education for Louisiana's children.

A bare majority of this Court strikes this legislature down without formulating reasons for its action and with full knowledge of the reasons announced in this dissent. Impressed as this question is with such a vital interest to the children of this State, the majority action cannot be justified.

I dissent.

## APPENDIX

### Act No. 223

### House Bill No. 369

By: Messrs, Guidry, Leithman, Vesich, Angelle, Marcel, Marionneaux, Lebreton, Crais, Labord, Miller, O'Brien, Hessler, Guilliot, Sutterfield, Schmitt, Cheek, Broussard, Booker, T. A. Casey, Breaux, Simon, Lauricella, Soniat, Anzelmo, Gregson, Fortier, Boesch, Ward, Lofaso, Cefalu, J. S. Casey, Bordes, Hainkel, Bagert and DeJean and Mrs. Laperouse.

## AN ACT

Providing for the purchase by the State of Louisiana of secular educational services from teachers employed by nonpublic schools and establishing procedures by which the State Superintendent of Public Education shall execute and regulate contracts for such purchases.

Be it enacted by the Legislature of Louisiana:

Section 1. Short Title: This act may be referred to as the "Louisiana Secular Educational Services Act."

Section 2. Findings of fact, Declaration of Necessity, and Statement of Public Policy. It is hereby determined and declared as a matter of legislative finding:

(a) A clear and present crisis exists in the State of Louisiana with respect to the education of children in elementary and secondary schools.

(b) This crisis is the result of unprecedented rising costs in all areas of operation, and unprecedented demand for improvement in the quality and calibre of education and opportunities for education available for Louisiana children, including those who are being educated in nonpublic schools;

(c) Certain of the financial aspects of this crisis in education in nonpublic schools

are the direct result of state and local government taxation to support pay increases for public school teachers, and to defray costs of improved public school facilities; nonpublic schools have been reduced to a noncompetitive position for the employment of qualified teachers of secular educational subjects;

(d) In some of its aspects the crisis in education is national in scope, e. g., the demand for excellence in all programs of instruction, for the creation and implementation of innovative methods and techniques of teaching and for improvement of teacher salary schedules to assure a high level of quality within the teacher corps itself;

(e) That the State of Louisiana recognizes the fact that its literacy rate is among the lowest in the nation and that only through continued concentrated efforts on the part of the Legislature and educators can the educational level be raised;

(f) That the elementary and secondary education of children is today recognized as a public welfare purpose; that nonpublic education, through providing instruction in secular subjects, makes an important contribution to the achieving of such public welfare purpose; that the governmental duty to support the achieving of public welfare purposes in education may in part be fulfilled through governmental contracts for secular educational services provided by teachers in nonpublic schools.

(g) Attendance of children at nonpublic schools constitutes compliance with the Louisiana Compulsory School Attendance law; and that nonpublic education in the State of Louisiana today, as during past years, bears the burden of educating 15 per cent of all elementary and secondary school pupils in Louisiana, thus making a significant educational and economic contribution to education in the state;

(h) It is in the public interest that all Louisiana children receive the best education its citizens can provide; that the State of Louisiana has the right, the responsibility, the duty and the obligation, in order to accomplish the objective of quality education for Louisiana children, to provide financial assistance to qualified teachers of secular subjects in nonpublic schools, by the purchase of their secular educational services.

Section 3. Definitions. The following terms, whenever used or referred to in this Act, shall have the following meaning and interpretation:

(a) "Nonpublic School Teacher" means any person employed by an approved nonpublic school, as defined herein, for the teaching of secular subjects in such school.

(b) "Approved Nonpublic School" means

(1) Any non-profit elementary of secondary school within the State of Louisiana or which may hereafter be established within the state of Louisiana, offer-

ing education to the children of this state in any grades from grades one through twelve, wherein a pupil may fulfill the requirements of the Compulsory School Attendance Law;

(2) which is supported predominately from funds or property derived from nongovernmental sources; and

(3) No teacher shall be denied the benefits of this Act because of his or her race, creed, religion or national origin and no teacher shall be denied the benefits of this Act because of the race, creed, religion or national origin of the children he or she teaches.

(c) "Purchase of Secular Educational Services" means the purchase by the Department of Education, from a school teacher, of services in teaching secular subjects to children enrolled in approved nonpublic schools. Payments shall be made directly to the teacher and such payments shall not exceed the State scale paid to teachers in the public school system.

(d) "Secular Subject" means any course of study in the curricula of the public schools, and shall include, but not necessarily be limited to, the teaching of mathematics, language arts, general and physical sciences, physical education, art and music, crafts and trades, home economics, or any other course of study in the curricula of the public schools, other than those involving the teaching of religious beliefs or any form of worship of any sect or religion.

Section 4. The State Superintendent of Public Education shall administer this Act and shall:

(a) Make contracts for the purchase of secular educational services directly with teachers of secular subjects;

(b) Establish appropriate rules and regulations for the approval of schools and school teachers hereunder, including such regulations as may be necessary for a determination that this Act is being lawfully and properly administered;

(c) Prescribe forms and establish procedures to enable nonpublic school teachers in the State of Louisiana to make application and contract for the sale of secular educational services.

Section 5. There is hereby created the "Secular Educational Services Fund," which shall be administered by and under the control of the Superintendent of Public Education. All expenses and disbursements in connection with the administration and implementation of this Act shall be made exclusively from said fund. No state funds dedicated to the support of the public schools of Louisiana shall form a part of the "Secular Educational Services Fund" or in any way be used in the implementation of this Act.

In the event that, in any fiscal year, the total revenues paid into the "Secular Educa-

tional Services Fund" shall be insufficient to pay the total amount of approved teacher contracts under this Act, such contracts shall be paid in an amount equal to the proportion which the total amount of such contracts bears to the total amount of monies available in said Fund.

This Act shall not be implemented by appropriation or otherwise until on and after the date on which the pay schedule for public school teachers under Act 397 of 1968 is implemented.

Section 6. If any provision or item of this Act is held invalid, such invalidity shall not affect other provisions of this Act which can be given effect without the invalid provisions.

Section 7. All laws or parts of laws in conflict with any of the provisions of this Act are hereby expressly repealed.

A true copy:

WADE O. MARTIN, JR.
　Secretary of State

This bill have been submitted to the Governor and no action having been taken within the time provided by the Constitution, said bill becomes law without his approval.

It was, and is, my intention to fully concur in the action of the Legislature in adopting this bill, and it was only due to inadvertence caused by the great volume of bill signing that I failed to sign this bill timely.

JOHN J. McKEITHEN
July 10, 1970

A true copy:

WADE O. MARTIN, JR.
　Secretary of State

APPENDIX

ACT No. 314

House Bill No. 1048
By: Mr. Guidry

AN ACT

To appropriate the sum of Ten Million Dollars ($10,000,000) our of the General Fund of the State of Louisiana for the fiscal year 1970–1971 to the State Department of Education for the implementation of the "Louisiana Secular Educational Services Act" as provided for the House Bill No. 369, Act No. ——, adopted by the 1970 Regular Session of the Legislature of Louisiana.

Be it enacted by the Legislature of Louisiana:

Section 1. The sum of Ten Million Dollars ($10,000,000) is hereby appropriated out of the General Fund of the State of Louisiana for the fiscal year 1970–1971 to the State Department of Education to be

used for implementation of the "Louisiana Secular Educational Services Act" as provided for in House Bill No. 369, Act No. ——, adopted by the Legislature of Louisiana at the 1970 Regular Session thereof.

Section 2. All laws or parts of laws in conflict herewith are hereby repealed.

Approved by the Governor July 10, 1970

A true copy:

WADE O. MARTIN, JR.
   Secretary of State

HAMLIN, Justice (dissenting):

I respectfully dissent from the majority opinion.

Simply stated, as I see the situation under consideration, Act 223 of 1970, is an act providing for the *purchase* by the State of Louisiana of secular educational services from teachers employed by non-public schools.

There is nothing in the Constitution of Louisiana for the year 1921 that prohibits the enactment of such a statute or the purchase of such services.

This is not a statute respecting an establishment of religion or prohibiting the free exercise thereof; it does not give preference to or make any discrimination against any church, sect, or creed of religion, or any form of religious faith or worship.

It is not to aid any church, sect or denomination of religion; it is not to aid any priest, preacher, minister or teacher of *religion.*

It does not provide for an appropriation of public funds to any private or sectarian school. It merely provides for a *contract to purchase educational services,* such contract to be entered into with the teacher individually.

As I interpret McCulloch v. Maryland, 4 Wheaton 316, 4 L.Ed. 579 (1819), where a law is not prohibited by the Constitution and is really calculated to affect any of the objects entrusted to the government (the education of its children, as this one is), it is constitutional.

I respectfully dissent.

TATE, Justice (dissenting).

I respectfully dissent from the majority's holding that the statutes in question are unconstitutional on their face.

I start with the premises we all must share: Acts of the legislature, the principal policy-making organ of the people, are presumed to be constitutional. In the absence of clear showing of unconstitutionality, a statute cannot be declared unconstitutional by the courts. The courts must resolve all doubts in favor of the constitutionally of a statute. They must thus defer to the solemn expression of law by the people through the legislature.

The learned majority and dissenting opinions of my brethren demonstrate that be-

fore us is a complex and sensitive issue. Reasonable men may well differ in the resolution of these issues, at least if no weight is given to the presumption of legislative validity.

As the majority opinion correctly states, the question is primarily one of degree. Is the supplement to the pay of teachers in private schools so extensive and direct a contribution to the operation of these schools as to amount to the use of public tax funds to operate private or sectarian schools in violation of the state constitution? Is such pay to these teachers of such degree and nature as to be an aid to religious schools themselves, violating the neutrality of government with regard to religious establishments required by our state and federal constitutions—in short, is the nature and degree of this supplemental teachers' pay such that it violates the constitutional test that there must be a secular purpose and a primary effect that neither advances nor inhibits religion?

Generalities aside, let us look at the statutes (and the plural is used advisedly, since the acts must be read together to ascertain the legislative scheme), and then at the state constitutional provisions they are alleged to offend.

Act 223 (the Louisiana Secular Educational Act) recite the present financial crisis faced by this state in affording equal educational opportunities to *all* our children, and the consequent need to provide financial assistance to qualified teachers of secular subjects in nonpublic schools. The statute then provides for doing so through the state Superintendent of Public Education's entering into contracts directly with teachers of secular (only) subjects to purchase their secular educational services for the children in nonpublic schools of the state.

The enactment further provides that such direct payments to the teachers shall not exceed the state (minimum) scale paid to public school teachers. Of some importance to resolution of the present question—whether the *two* statutes are unconstitutional *on their face*—is this further provision of Act 223: In the event total revenues appropriated are insufficient to pay the total amount of valid teacher contracts entered into, then the teachers will receive only a proportion of their pay from public funds (Section 5).[1]

The companion statute (Act 314) appropriates ten million dollars for this supplemental pay of teachers in private schools. As the majority recognizes, this is only a fraction of the amount needed to assure teachers in private schools of receiving the

---

1. The act provides that no funds dedicated to public school support shall be used for such purpose, and it also provides that no funds shall be so used until public school teacher salaries are fully implemented in accordance with the state scale.

same minimum salaries paid to public school teachers—perhaps 20% or less.

Reading the two statutes together, then, the legislative scheme is simply to *supplement* the pay of teachers in private schools by paying them a fractional portion of the minimum pay scale of public school teachers. Since we are passing on the constitutionality *on their face* of these statutes, we are in error if we reach beyond their terms to imagine that in operation it will or could amount to payment by the state of the · total salary of teachers in private schools.[2]

Viewing this actual factual and statutory context of these two enactments, in my view they clearly do not offend the state constitutional provisions cited nor the federal First Amendment's prohibition of laws "respecting the establishment of religion".

Article IV, Section 8, of our state constitution prohibits the taking of public

funds, "directly or indirectly, in aid of any * * * religion, or in aid of any teacher, thereof, *as such* * * *." The statutes clearly specify that the funds used will only be used for teachers of secular subjects. The funds will not be used to pay teachers of religion *as such*. Likewise, the provision of these funds for educational purposes is for a public purpose, not for any private, charitable or benevolent purpose within the prohibition of this state constitutional section.[3]

Again, Article VII, Section 13 of our state constitution provides: "No appropriation of public funds shall be made *to* any private or sectarian school." The present funds are *not* appropriated to any school; nor, considering the narrow construction to be given to restrictions of the state constitution upon the exercise of legislative power, can it reasonably be said that, by interpretation, the scope of this prohibition can be expanded to include the furnishing of

---

**2.** Perhaps the majority's objection based upon fear of this result could be removed by legislative revision.

As I see it, however, we are not truly faced with such an objection to the act—that the aid to teachers will be so extensive as to amount to relieving schools of their obligation to pay teachers' salaries and thus constitute an aid to the schools, rather than to the children through the teachers and to the teachers themselves. On their face, the statutes do not constitute such extensive aid. The courts are not faced with this issue now. If in some far distant day they are, through future enlargement of the aid, *then* is the time to decide *that* issue, not before

us *now*, in the context of such future times.

**3.** Arguments similar to those advanced here were long ago rejected by this court in Borden v. Louisiana State Board of Education, 168 La. 1005, 123 So. 655, 660–661 (1929) and Cochran v. Louisiana State Board of Education, 168 La. 1030, 123 So. 664 (1929). In upholding the distribution of free textbooks to the children of the state, whether in private (including religious) or public school, we pointed out that such grant was for a public purpose, in that it was for a valid governmental aim—education; and that it was the furnishing of books to the children, not to the school.

supplemental pay directly to teachers of children attending nonpublic schools.

The least frivolous attack upon the constitutionality of these measures is founded, in my opinion, upon the contention that they might possibly violate the separation of church and state required by the prohibitions against laws favoring the establishment of religion found in the First Amendment of our federal constitution and, in similar terms, in Article I, Section 4, of our state constitution.

Aside from the scholarly discussion in legal terms of this issue found in the majority and dissenting opinions, the provision of supplemental pay to teachers of secular (non-religious) subjects in all nonpublic schools, simply does not (in terms of the enactments themselves and of their factual and statutory context) amount to support of such nature and degree as to constitute a contribution with a primary effect of aiding religion and sectarian purposes.

The same arguments used here to reject supplemental pay for teachers of children in religious schools could equally well have been utilized to prohibit the state from providing schoolbooks and bussing for them. They have instead been rejected consistently by the courts of this state and of many jurisdictions which have considered them.

The majority errs, in my opinion, in finding the present aid to the education of children in nonpublic schools essentially different in nature and degree from the types of aid to them previously held permissible. We thus invalidate this 1970 legislature's attempt to solve a 1970 problem, basically because it is a different approach than that used in the past. This court exceeds its function when it restricts the legislature's choice of method to the formulae of the past.

I am not unsympathetic to the American vision of public education—that a broad education of all our children should be made possible through a system of public education, unifying in common experience the children of our nation drawn from diverse cultural, ethnic and religious backgrounds. Perhaps the cause of education might indeed be best advanced by devoting all available funds to the public schools of the state.

On the other hand, we are faced with present-day facts, not solely with philosophies. In *fact*, many of the children of our state will attend nonpublic schools. Is it better for the commoweal that these children, because of their choice of a nonpublic school or the choice of their parents, be deprived of equal education opportunities, just to preserve inviolate the theory of the single public educational system?

The question, however, involves primarily a legislative choice. After prolonged consideration and sometimes bitter debate, the 1970 legislature by a narrow majority approved the enrichment of the educational opportunities of children who attend non-

public schools through supplementing the pay of their teachers, thus helping to assure sufficient numbers and a better quality of teachers for them.

I do not believe it to be appropriate for this court, as a sort of super-legislature, to impose its own views of this sensitive issue, and to strike down as invalid the legislature's deliberate and solemn choice of values.

The majority errs, in my opinion: (a) by resolving doubts against the constitutionality of these enactments (contrary to our constitutional doctrines relating to the proper separation of powers between the legislative and judicial branches of our government); (b) by not recognizing that we are essentially concerned with the *degree* of public aid to *children,* in nonpublic schools, rather than with payments to religious schools or to religious teaching or other direct assistance to particular religions; and (c) by overlooking that, under the *present* facts and enactments, the payment of supplemental pay to teachers does not constitute establishing religious schools, payments to religious schools, or payments to teachers of religion *"as such"*, as would violate the constitutional prohibitions relied upon.

For these reasons, I respectfully dissent.

Rehearing denied.

HAMLIN, SUMMERS and TATE, JJ., are of the opinion that a rehearing should be granted.